## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WISCONSIN

Kevin Kasten and James Poole
individually and on behalf of others                                  Case No. 07-C-0449-S
similarly situated,

        Plaintiffs,

v.

Saint-Gobain Performance Plastics Corporation,

        Defendant.

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION TO DECERTIFY PLAINTIFFS' COLLECTIVE ACTION

### INTRODUCTION

Defendant essentially asks the Court to decertify this collective action because of differences in each Plaintiff's damage calculation.  However, differences in damages are not grounds for decertification. Kautsch v. Premier Communications, 2008 WL 294271, at *3-4 (W.D. Mo. Jan. 31, 2008)[1].  Haugen Aff. Ex. 1.  Rather, the question is whether the opt-in Plaintiffs are "similarly situated" to the named Plaintiffs, whether individualized defenses apply to the Plaintiffs' group, and "fairness and procedural considerations."

An evaluation of these relevant factors results in the inevitable conclusion that this case should proceed to trial as a collective action.  Plaintiffs are not only similarly

---

[1]  All exhibits and unpublished opinions are attached to the Affidavit of Adrianna S. Haugen in Opposition to Defendant's Motion to Decertify Plaintiffs' Collective Action.

situated, they are almost **identically** situated.  They all: (1) worked at the exact same location; (2) were subject to the same donning and doffing requirements; (3) had the same upper-level supervisors and management; (4) received the same training; (5) were subject to the same time-keeping policies and procedures; (6) were subject to the same compensation policies and procedures; and, (7) most importantly, Defendant required all of them to don and doff protective gear without compensation.  Additionally, Defendant readily admits that all of the Plaintiffs are subject to the same two alleged defenses: the *de minimus* defense, and the assertion of a "set-off."  Finally, with respect to "fairness and procedural considerations," anything other than a collective trial of these claims would result in an absurd and unprecedented calamity of repetition and judicial inefficiency.

Because Defendant is unable to cite any authority, or other justification, for the decertification of this FLSA collective action under circumstances so heavily weighed toward a collective trial, Plaintiffs respectfully request that the Court deny Defendant's motion.

### FACTS RELEVANT TO DECERTIFICATION

Defendant Saint-Gobain Performance Plastics Corporation ("Defendant") operates a manufacturing facility in Portage, Wisconsin.  (Haugen Aff. Ex. 2 ¶ 3, Haugen Aff. Ex. ¶ 3.)  On August 15, 2007, two of Defendant's former employees from the Portage plant, Kevin Kasten and James Poole, brought this collective and class action lawsuit on behalf of themselves and other similarly situated manufacturing and production workers from Defendant's Portage, Wisconsin facility ("Plaintiffs").  (Compl.)  Plaintiffs claim that

they were not compensated for all of the time they spent donning and doffing protective gear for Defendant's benefit.  (Compl.)

1.      **Defendant Requires Workers To Don Protective Gear To Prevent Contamination Of Its Products And To Facilitate Production.**

Defendant manufactures a number of products which must remain free from external sources of contamination.  (Rule 30(b)(6) Corp. Rep. Rule 30(b)(6) Corp. Rep. Sawicky Dep. at 11, 29, 33, Nov. 13, 2007.)   Defendant's products include silicone rubber components for medical devices, high volume products, such as spatulas and spoons, and custom-made products.  (Rule 30(b)(6) Corp. Rep. Sawicky Dep. at 9-10, 26, Nov. 13, 2007; Riley Dep. at 17, Feb. 21, 2008; Woolverton Dep. at 12-13, Feb. 19, 2008.)   In an effort to protect its products from external sources of contamination, and enable workers to perform the functions of their jobs without serious injuries or burns, Defendant requires manufacturing and production workers to engage in a "gowning" process whereby they don protective gear, sanitize their hands, and clean their shoes before going to their work stations.  (Rule 30(b)(6) Corp. Rep. Sawicky Dep. at 11, 18, 29, 33, Nov. 13, 2007; Tolles Dep. at 17, Feb. 19, 2008.)  (See also Rule 30(b)(6) Corp. Rep. Stacey Dep. at 20, Nov. 14, 2007 (identifying the hourly-paid positions in which the gowning process is required).)

2.      **The Type Of Required Gear Varies According To The Location And Type Of Work Performed.**

The type of gear workers are required to wear varies depending upon where they are stationed in the facility, and what work they will perform for the day.  (Tolles Dep. at 16, Feb. 19, 2008; Rule 30(b)(6) Corp. Rep. Sawicky Dep. at 11-12, 19, 31, 57-58, Nov.

13, 2007.)   The Portage plant consists of four general areas with respect to gowning requirements: (1) Platinum Clean Room 1 and 2; (2) General Manufacturing; (3) Extrusion; and (4) Other Areas.  (Rule 30(b)(6) Corp. Rep. Sawicky Dep. at 22-23, Nov. 13, 2007; Haugen Aff. Ex. 9.)   Workers who enter Platinum Clean Rooms 1 and 2 generally wear safety shoes, safety glasses, hair covers, beard covers, jump suits, ear plugs, gloves, shoe covers, and arm guards.  (Rule 30(b)(6) Corp. Rep. Sawicky Dep. at 23-24, 29, Nov. 13, 2007; Rule 30(b)(6) Corp. Rep. Stacey Dep. at 26, Nov. 14, 2007.) Workers who enter the General Manufacturing area are required to wear safety shoes, safety glasses, hair covers, beard covers, lab coats, ear plugs, gloves, shoe covers, and arm guards.  (Rule 30(b)(6) Corp. Rep. Sawicky Dep. at 25-26, Nov. 13, 2007.)  Workers who enter the Extrusion area wear safety shoes, safety glasses, hair covers, beard covers, jump suits, earplugs, and gloves.  (Rule 30(b)(6) Corp. Rep. Sawicky Dep. at 27-29, Nov. 13, 2007.)

The areas of the plant designated "Other" include the Development Center, Tool Room, and Hydraulics areas.  (Rule 30(b)(6) Corp. Rep. Sawicky Dep. at 22-23, Nov. 13, 2007; Haugen Aff. Ex. 9.)  Workers who enter the Development Center area wear safety shoes and safety glasses, and sometimes hair covers, beard covers, lab coats, ear plugs, gloves, and arm guards, depending upon what products are being produced.  (Rule 30(b)(6) Corp. Rep. Sawicky Dep. at 29, 31, 57-58, Nov. 13, 2007.)  Workers who enter the Tool Room and Hydraulics areas generally wear safety shoes and safety glasses. (Rule 30(b)(6) Corp. Rep. Sawicky Dep. at 21-22, 29, Nov. 13, 2007.)

Workers do not work in the same area of the plant every day.  (See Kasten Dep. at 29-33, Feb. 22, 2008 (working first and third shift in General Manufacturing and Other areas); Bond Dep. at 10-14, Jan. 31, 2008 (working first shift in General Manufacturing and Extrusion); Benson Dep. at 6-8, Jan. 30, 2008 (working second and third shifts in Platinum Clean Room 1, Extrusion, and General Manufacturing); Crotty Dep. at 15-17, Jan. 29, 2008 (working first and second shift in General Manufacturing and Extrusion); Bethke Dep. at 12-13, Jan. 28, 2008 (working first shift in General Manufacturing and Extrusion); Hayes Dep. at 14-16, Jan. 28, 2008 (working second shift in General Manufacturing, Extrusion, and Other areas); Jesberger Dep. at 11-13, Jan. 28, 2008 (working first shift in General Manufacturing, Extrusion, and Platinum Clean Room 2); Leitner Dep. 25-26, 30-34, Jan. 30, 2008 (working third shift in General Manufacturing, Extrusion, Platinum Clean Rooms 1-2, and Other areas); Miller Dep. at 10-14, Jan. 30, 2008 (working first and second shift in General Manufacturing, Extrusion, and Platinum Clean Room 1); Poole Dep. at 23-26, Jan. 30, 2008 (working second shift in General Manufacturing, Extrusion, and Platinum Clean Rooms 1-2); Watson Dep. at 7-12, Jan. 31, 2008 (working first shift in General Manufacturing and Platinum Clean Room 1); Wetherall Dep. at 11, 15, 19, Jan. 29, 2008 (working first shift in General Manufacturing, Extrusion, and Platinum Clean Room 1).)  Because workers are frequently assigned to work in different areas of the plant, they are each required to undergo various gowning routines depending upon their assignment.  (Bond Dep. at 14, Jan. 31, 2008 ("[Y]our day was never the same.  You could be [in General Manufacturing], and by after lunch, you could be over in extrusion.  It depended upon . . . the day and how they scheduled it.").)

5

The two named Plaintiffs have worked all relevant shifts and locations, meaning that at one time or another, they donned and doffed all applicable combinations of gear. (Kasten Dep. at 29-33, Feb. 22, 2008 (working first and third shift in General Manufacturing and Other areas); Poole Dep. at 23-26, Jan. 30, 2008 (working second shift in General Manufacturing, Extrusion, and Platinum Clean Rooms 1-2)).

**3.      Hourly-Paid Manufacturing And Production Workers Are Required To Clock-In And Clock-Out To Record Their Compensable Work Time.**

All hourly-paid manufacturing and production workers at the Portage plant are given individualized Kronos cards to clock-in and clock-out for their shifts and meal breaks on time clock machines. (Rule 30(b)(6) Corp. Rep. DeSimone Dep. at 27-28, 37, Nov. 13, 2007.) The Kronos system records each worker's work time, based on the time clock punch times and the shift assigned to each worker in the system. (Rule 30(b)(6) Corp. Rep. DeSimone Dep. at 27-29, Nov. 13, 2007.) Defendant bases its weekly payroll and reporting to temporary placement agencies on the Kronos reports for the workers. (Rule 30(b)(6) Corp. Rep. DeSimone Dep. at 27-29, Nov. 13, 2007.)

With the exception of third shift workers, who receive a twenty-minute paid meal break, hourly manufacturing and production workers receive an unpaid thirty-minute lunch break with an additional five-minute paid wash-up period. (Rule 30(b)(6) Corp. Rep. Stacey Dep. at 17, Nov. 14, 2007; Rule 30(b)(6) Corp. Rep. DeSimone Dep. at 37, Nov. 13, 2007; Williams Dep. at 62, Feb. 20, 2008; Brown Dep. at 52, Feb. 20, 2008; Riley Dep. at 36, Feb. 21, 2008.) Although workers are required to clock-out during these meal breaks, the Kronos system automatically deducts one-half hour of time for a

meal break even if the full thirty-minute break is not enjoyed by the employee.  (Riley Dep. at 53, Feb. 21, 2008.)  Plaintiff Kasten has received both paid and unpaid breaks, because he worked multiple shifts.  (Kasten Dep. at 29-33, Feb. 22, 2008 (working first and third shift in General Manufacturing and Other areas).

### 4.     All Manufacturing And Production Workers Are Subject To The Same Donning And Doffing, Meal Break, Time Clock, And Compensation Policies And Procedures.

Defendant trains all manufacturing and production workers on the same donning and doffing, meal break, and time clock procedures during orientation.  (Rule 30(b)(6) Corp. Rep. Sawicky Dep. at 48-49, 62, Nov. 13, 2007; Williams Dep. at 46, Feb. 20, 2008; Woolverton 91-92, Feb. 19, 2008.)  All manufacturing and production workers are instructed to begin the workday by going to the locker room to remove their outer clothing, changing into their safety shoes, and putting on their safety glasses.  (Rule 30(b)(6) Corp. Rep. Sawicky Dep. at 43-44, 51, 53-55, Nov. 13, 2007.)  Next, they proceed to the gowning area to don the remaining required gear.  (Rule 30(b)(6) Corp. Rep. Sawicky Dep. at 51, 53-55, Nov. 13, 2007.)  Some workers are also required to sanitize their hands or clean their shoes in a shoe cleaner.  (Rule 30(b)(6) Corp. Rep. Sawicky Dep. at 51, 53-55, Nov. 13, 2007.)  This process is repeated before workers return from their meal breaks.  (Rule 30(b)(6) Corp. Rep. Sawicky Dep. at 59, 62, Nov. 13, 2007; Riley Dep. at 53, Feb. 21, 2008.)  Workers also complete this process in reverse when they leave their workstations for their meal breaks, and at the end of their shifts. (Rule 30(b)(6) Corp. Rep. Sawicky Dep. at 49, 53, Nov. 13, 2007.)

5.   **Prior To December 11, 2006, Defendant Required All Manufacturing And Production Workers To Clock-In After Donning, And Clock-Out Before Doffing Protective Gear.**

Prior to December 11, 2006, these donning and doffing routines took place off-the-clock.[2]  (Rule 30(b)(6) Corp. Rep. Stacey Dep. at 62-63, Nov. 14, 2007; Rule

---

[2] The amount of time the Plaintiffs reported that they spent donning and doffing pre and post-shift ranged between six and thirty minutes, with an average time of 13.15 to 14.6 minutes.  The range of time the Plaintiffs reported that they spent donning and doffing during their lunches ranged between eight and twenty minutes, with average times of 11.25 to 12.5.  Hourly paid manufacturing and production workers who were scheduled for 30 minute unpaid meal breaks were not given a full 30 minutes of duty-free time because they were donning and doffing gear during a portion of this time.  (Benson Dep. at 28-29, 56, Jan. 30, 2008, (Donning and doffing time of 13-22 minutes pre and post-shift); Bethke Dep. at 21-24, Jan. 30, 2008 (Donning and doffing time of 10 minutes pre and post-shift and 10 minutes at lunch); Bond Dep. at 20-24, 32, Jan. 31, 2008 (Donning and doffing time of 16-18 minutes pre and post-shift and 8 minutes at lunch); Livingston Dep. at 16, 26-28, 29, Jan. 30, 2008 (Donning and doffing time of 10 minutes pre and post-shift and 8 minutes at lunch); Wetherall Dep. at 23, 26, 29-30, Jan. 29, 2008 (Donning and doffing time of 16-20 minutes pre and post-shift); Watson Dep. at 26, 28, Jan. 31, 2008 (Donning and doffing time of 6 minutes pre and post-shift); Poole Dep. at 34-35, 41, 42, Jan. 30, 2008 (Donning and doffing time of 9-10 minutes pre and post-shift); Evans Dep. at 30, 41, Jan. 29, 2008 (Donning and doffing time of 12-14  minutes pre and post-shift); Hayes Dep. at 22, 34-35, 36-37, Jan. 28, 2008 (Donning and doffing time of 17 minutes pre and post-shift and 10 minutes at lunch); Jesberger Dep. at 19, 25-26, 32, Jan. 28, 2008 (Donning and doffing time of 18-23  minutes pre and post-shift); Kasten Dep. at 40, 53, Feb. 22, 2008 (Donning and doffing time of 8-12  minutes pre and post-shift);  Leitner Dep. at 59, Jan. 30, 2008; Leitner Dec. ¶¶ 8, 10, Oct. 22, 2007 (Donning and doffing time of 12-14 minutes pre and post-shift) Haugen Aff. Ex. 27; K. Bethke, Dec. ¶¶ 8, 10, 11, Nov. 20, 2007 (Donning and doffing time of 11 minutes pre and post-shift and 10-15 minutes at lunch) Haugen Aff. Ex. 28; Yapp Dec. ¶¶ 8, 10, 11, Oct. 29, 2007 (Donning and doffing time of 19  minutes pre and post-shift and 19 minutes at lunch) Haugen Aff. Ex. 29; Bignell Dec. ¶¶ 8, 10, Oct. 2, 2007 (Donning and doffing time of 14 minutes pre and post-shift) Haugen Aff. Ex. 30; Wright Dec. ¶¶ 8, 10, Oct. 19, 2007 (Donning and doffing time of 30 minutes pre and post-shift) Haugen Aff. Ex. 31; Kilburg Dec. ¶¶ 8, 10, 11, Feb. 29, 2008 (Donning and doffing time of 13 minutes pre and post-shift and 15-20  minutes at lunch) Haugen Aff. Ex. 32; Ratliff Dec. ¶¶ 8, 10, Nov. 20, 2007 (Donning and doffing time of 8 minutes pre and post-shift) Haugen Aff. Ex. 33; Strand Dec. ¶¶ 8, 10, Oct. 11, 2007 (Donning and doffing time of 8 minutes pre and post-shift) Haugen Aff. Ex. 34; Mergenthaler Dec. ¶¶ 8, 10, 11, Oct. 24,

30(b)(6) Corp. Rep. Sawicky Dep. at 52-53, Nov. 13, 2007; Williams Dep. at 17, Feb. 20, 2008; Brown Dep. at 31, 44, Feb. 20, 2008).   Most hourly-paid manufacturing and production workers were required to clock-in after they donned, and clock-out before they doffed the required gear, so that they were not paid for this time.   (Rule 30(b)(6) Corp. Rep. Stacey Dep. at 62-63, Nov. 14, 2007; Rule 30(b)(6) Corp. Rep. Sawicky Dep. at 52-53, Nov. 13, 2007; Williams Dep. at 17, Feb. 20, 2008.)   This is because the time clocks were located past the locker rooms and gowning areas, near the work stations. (Rule 30(b)(6) Corp. Rep. Stacey Dep. at 62-63, Nov. 14, 2007; Rule 30(b)(6) Corp. Rep. Sawicky Dep. at 52-53, Nov. 13, 2007; Williams Dep. at 17, Feb. 20, 2008; Brown Dep. at 31, 44, Feb. 20, 2008).   However, on December 11, 2006, Defendant placed time clocks near the employee entrance, so that workers could clock-in prior to donning, and clock-out after doffing required gear.   (Brown Dep. at 31-32, 38, Feb. 20, 2008; Rule 30(b)(6) Corp. Rep. Stacey Dep. at 32-33, Nov. 14, 2007; Rule 30(b)(6) Corp. Rep. Sawicky Dep. at 52-53, 55, Nov. 13, 2007; Haugen Aff. Exs. 9, 36.)

The only exception to this rule was with respect to Platinum Clean Rooms 1 and 2, which had a time clock located just outside the gowning area.   (Rule 30(b)(6) Corp. Rep. Sawicky Dep. at 44-45, Nov. 13, 2007.)[3]   However, workers entering Platinum Clean

---

2007 (Donning and doffing time of 10 minutes pre and post-shift and 10 minutes at lunch) Haugen Aff. Ex. 35.)

[3] Defendant claims that when workers were stationed in the Extrusion area, they were also paid for their donning and doffing time.   However, as explained above, this issue is not dispositive, because workers were not consistently stationed in a single area.   Further, even if a worker who was scheduled in Extrusion used a time clock in an area other than Extrusion at the start of the shift, off-the-clock donning was still required to enter the area

Rooms 1 and 2 were still required to go to the locker room area, replace their street shoes with their safety shoes, put on safety glasses, and walk across the plant prior to clocking-in for their shifts.  (Rule 30(b)(6) Corp. Rep. Sawicky Dep. at 43-44, Nov. 13, 2007.); (Haugen Aff. Ex. 9.)

However, on December 11, 2006, Defendant placed time clocks near the employee entrance, so that workers could clock-in prior to donning, and clock-out after doffing required gear.  (Brown Dep. at 31-32, 38, Feb. 20, 2008; Rule 30(b)(6) Corp. Rep. Stacey Dep. at 32-33, Nov. 14, 2007; Rule 30(b)(6) Corp. Rep. Sawicky Dep. at 52-53, 55, Nov. 13, 2007; Haugen Aff. Exs. 9, 36.)  Plaintiffs' collective action donning and doffing claims, therefore, pertain to the timeframe prior to the placement of the time clocks near the employee entrance.  (See Compl.; Conditional Class Cert. Briefs; and Court Order.)

## 6. Defendant Admits That The Time Workers Spend Donning And Doffing Gear Is Compensable.

Defendant admits that workers should have been paid for donning and doffing the gear required at the Portage facility:

Q. . . . Does the company believe it is appropriate to pay people for putting on these items and taking them off?

A.   The company feels it's appropriate to pay people for the work they perform, and a typical day, as I described, they are paid.

Q.  So does the company believe that part of the work that people perform includes putting on these items and taking them off?

A.  That's part of an employee's workday, yes.

of that particular time clock.  (Benson Dep. at 21-23, Jan. 30, 2008.)  Additionally, over lunch breaks and at the end of each shift, workers scheduled in the Extrusion area were required to don and doff gear off-the-clock, and did not use the time clocks in another area of the plant.  (Benson Dep. at 27-31, Jan. 30, 2008.)

(Rule 30(b)(6) Corp. Rep. Stacey Dep. at 34, Nov. 14, 2007.)  Plant Manager, Dan Tolles

stated, "You're paid for time worked.  That's the rule."  (Tolles Dep. at 81, Feb. 19,

2008.)

## ARGUMENT

Under section 216(b) of the Fair Labor Standards Act of 1938, 29 U.S.C. § 201 et

seq. ("FLSA"), "employees may bring an action to recover unpaid overtime

compensation 'for and in behalf of . . . themselves and other employees similarly

situated.'"  Austin v. CUNA Mut. Ins. Soc., 232 F.R.D. 601, 604 (W.D. Wis. 2006)

(quoting 29 U.S.C. § 216(b)).  This collective action provision is designed to provide for

cases like the present, "in which the **claims of different employees, different in amount**

**but all arising out of the same character of employment**, can be presented and

adjudicated, regardless of the fact that they are separate and independent of each other."

Shaine v. Armour & Co., 40 F. Supp. 488, 490 (W.D. Ky. 1941) (emphasis added).

Consistent with this policy, and for the reasons stated below, this case should proceed to

trial as a collective action.

## I.     THIS COURT APPLIES A TWO-STEP ANALYSIS TO DETERMINE WHETHER PLAINTIFFS ARE SIMILARLY SITUATED.

Since the FLSA does not define the term "similarly situated," courts have

developed a two-step process to determine whether plaintiffs are similarly situated for

certification of a collective action.  Austin, 232 F.R.D. at 605.  This Court has adopted

that two-step process.  Austin, 232 F.R.D. at 605; Sjoblom v. Charter Commc'n, LLC,

2007 WL 4560541, at *8 (W.D. Wis. Dec. 19, 2007).  Haugen Aff. Ex. 37.

11

In the first step, courts examine the pleadings and affidavits in the record, and using a fairly lenient standard, may "conditionally" certify a class and authorize judicial notice. Austin, 232 F.R.D. at 605. The collective class was conditionally certified in this case, and potential opt-in plaintiffs were notified. Haugen Aff. Ex. 38.

Defendant's Motion for Decertification places this case at the second step of the similarly situated analysis, which occurs near the close of discovery. Austin, 232 F.R.D. at 605. During this step, courts evaluate the evidence gathered during discovery in more detail to determine whether the plaintiffs are similarly situated for purposes of trial. Id. The issue before the court at this stage does not differ from the initial stage. Id. At both points in the suit, courts must determine whether the Plaintiffs are similarly situated. See id. The only significant difference between the two stages is the quantity of the factual record before the Court. See id. If the Court finds that any of the opt-in Plaintiffs are not similarly situated to the named Plaintiffs, it may dismiss them without prejudice. Id. The Court may also decertify the entire class if none of the class members are similarly situated. Id. However, because neither of these conditions is present here, this case should proceed to trial as a collective action. Id.

## II. THE SECOND STAGE OF THE TWO-STEP ANALYSIS INVOLVES THE CONSIDERATION OF THREE FACTORS, ALL OF WHICH HEAVILY FAVOR PROCEEDING AS A COLLECTIVE ACTION.

This case should proceed to trial as a collective action, because all of the opt-in Plaintiffs are similarly situated to the named Plaintiffs, and fairness and procedural considerations weigh heavily in favor of trying the case collectively. On a motion for decertification, courts consider three factors: (1) the disparate factual and employment

settings of the individual plaintiffs; (2) the various defenses available to the defendant that are individual to each plaintiff; and (3) fairness and procedural considerations.  See, e.g., Thiessen v. Gen. Elec. Capital Corp., 267 F.3d 1095, 1102-03 (11th Cir. 2001); Frank v. Gold'n Plump Poultry, Inc., 2005 WL 2240336, at *2 (D. Minn. Sept. 14, 2005) Haugen Aff. Ex. 39; Bradford v. Bed Bath & Beyond, 184 F. Supp. 2d 1342, 1346 (N.D. Ga. 2002); Moss v. Crawford & Co., 201 F.R.D. 398, 409 (W.D. Pa. 2000).  With respect to the first and second factors, the court determines whether the plaintiffs are in fact "similarly situated" so that they may proceed collectively through trial, or whether the case should be severed.  Kalish v. High Tech Inst., No. Civ.04-1440, 2005 WL 1073645, at *1 (D. Minn. Apr. 22, 2005).  Haugen Aff. Ex. 40.  The third factor, fairness and procedural considerations, is properly considered for the first time during this second-stage analysis.  Each of these factors weighs heavily against decertification of this case.

    **A.**    **The First Factor Weighs In Favor Of A Collective Action, Because All Of The Named And Opt-In Plaintiffs Have Nearly Identical Factual And Employment Settings.**

Plaintiffs are easily able to establish that they are similarly situated with respect to their factual and employment settings.  Plaintiffs and opt-ins need only be "similar, not identical" to remain certified as a collective class.  Hipp v. Liberty Nat'l Life Ins. Co., 252 F.3d 1208, 1217, 1219 (11th Cir. 2001).   Evidence that Plaintiffs were all subject to Defendant's "unified policy, plan, or scheme" is more than sufficient to demonstrate the Plaintiffs' similar situation.  Grayson v. K-Mart Corp., 79 F.3d 1086, 1095-96 (11th Cir. 1996); Moss, 201 F.R.D. at 409 (holding that the "differences in the plaintiffs' job duties,

geographic locations, and hourly billing rates do not destroy their collective claim for overtime wages under the FLSA.").

In evaluating this factor, courts across the country consider the overall similarities between plaintiffs by focusing on the defendant's policies and actions, rather than inquiring into the day-to-day variations in the plaintiffs' responsibilities. See, e.g., Pendlebury v. Starbucks Coffee Co., No. 04-80521-CIV, slip op. at 29 (S.D. Fla. Sept. 20, 2007) ("[E]very class under § 216(b) will have differences; however, class members need only be similar, not identical") Haugen Aff. Ex. 41; Hutton v. Bank of Am., No. CV 03-2262-PHX-ROS, slip op. at 3 (D. Ariz. Mar. 31, 2007) ("While Client Managers are managed by different Market Managers depending on their office location, this fact is not relevant for these time periods because all of the potential Plaintiffs were affected identically by Defendant's decision not to classify the Client Managers as overtime eligible under the FLSA.") Haugen Aff. Ex. 42; Doornbos v. Pilot Travel Ctrs. LLC, No. 04CV00044, slip op. at 4-5 (S.D. Cal. Apr. 25 2005) ("In spite of the fact-specific nature of the exemption inquiry, courts allow collective action treatment if Plaintiffs can demonstrate that they held identical or similar positions.").  Haugen Aff. Ex. 43.

### 1. Plaintiffs are not only "similarly situated," they are nearly identically situated.

All of the Plaintiffs in the present case worked in the same building, were supervised by the same upper-level management, and were subject to the same donning, doffing, time clock, and compensation policies, procedures, and training.  They were all required to wear specific types of protective gear in certain areas of the building.

Regardless of which time clock they used, they were all required to don protective gear prior to clocking-in, and doff protective gear after clocking-out.

Because most of the Plaintiffs performed multiple job functions in various areas of the building, Defendant's assertion that they are not similarly situated because they worked in different areas of the building from each other is simply not supported by the evidence. Plaintiffs cannot even be identified and divided by the particular area of the building in which they worked, because the vast majority worked in multiple areas on various shifts. (Bond Dep. at 10-14, Jan. 31, 2008 (working first shift in General Manufacturing and Extrusion); Watson Dep. at 7-12, Jan. 31, 2008 (working first shift in General Manufacturing and Platinum Clean Room 1); Benson Dep. at 6-8, Jan. 30, 2008 (working second and third shifts in Platinum Clean Room 1, Extrusion, and General Manufacturing); Leitner Dep. 25-26, 30-34, Jan. 30, 2008 (working third shift in General Manufacturing, Extrusion, Platinum Clean Rooms 1-2, and Other areas); Miller Dep. at 10-14, Jan. 30, 2008 (working first and second shift in General Manufacturing, Extrusion, and Platinum Clean Room 1); Crotty Dep. at 15-17, Jan. 29, 2008 (working first and second shift in General Manufacturing and Extrusion); Wetherall Dep. at 11, 15, 19, Jan. 29, 2008 (working first shift in General Manufacturing, Extrusion, and Platinum Clean Room 1); Bethke Dep. at 12-13, Jan. 28, 2008 (working first shift in General Manufacturing and Extrusion); Hayes Dep. at 14-16, Jan. 28, 2008 (working second shift in General Manufacturing, Extrusion, and Other areas); Jesberger Dep. at 11-13, Jan. 28, 2008 (working first shift in General Manufacturing, Extrusion, and Platinum Clean Room 2).) Changing from shift to shift, the named Plaintiffs also worked throughout the plant,

at all relevant locations, during all relevant shifts, donning and doffing all possible combinations of gear.  (Kasten Dep. at 29-33, Feb. 22, 2008 (working first and third shift in General Manufacturing and Other areas); Poole Dep. at 23-26, Jan. 30, 2008 (working second shift in General Manufacturing, Extrusion, and Platinum Clean Rooms 1-2).)  Thus, Plaintiffs' job responsibilities with respect to donning and doffing and use of the time clocks were not just similar, they were identical:  all of the Plaintiffs were required to don gear particular to the varying areas in which they would work for the day prior to clocking-in, and doff that gear after clocking out.

Nevertheless, Defendant makes the unreasonable argument that the collective action should be decertified because "[d]ifferences in donning and doffing procedures extend not only between employees, but also with the same employee."  (Def. Br. at 15.)  Along this line of reasoning, a separate suit would need to be filed not only for each individual Plaintiff, but for each day each Plaintiff worked, because of variations in routine.  This kind of microscopic scrutiny of the Plaintiffs' daily routines directly contravenes the purpose of the collective action provision of the FLSA.  In denying the defendant's motion to decertify a conditionally certified FLSA action in a strikingly similar donning and doffing case, Judge Schiltz of the Minnesota Federal District Court addressed this precise issue:

> Gold'n Plump exaggerates the factual differences among employees on various shifts and in different departments.  If one zooms in close enough on anything, differences will abound; even for a single employee doing a single job, the amount of time that she spends donning and doffing on Monday will differ, at least minutely, from the amount of time that she spends donning and doffing on Tuesday.  But plaintiffs' claims need to be considered at a higher level of abstraction.

16

Frank v. Gold'n Plump Poultry, Inc., No. 04-CV-1018, slip op., at *8 (D. Minn. Sept. 24, 2007).  Haugen Aff. Ex. 44.  The simple fact is that all of the Plaintiffs are similarly situated, because they were all affected identically by Defendant's decision not to require that they be paid for all of their donning and doffing time.  See, e.g. Wilks v. Pep Boys, 2006 WL 2821700, at *5 (M.D. Tenn. 2006) (stating that despite defendant's written policies to the contrary, plaintiffs submitted ample evidence that a practice of improperly recording wages and requiring off-the-clock work existed) Haugen Aff. Ex. 45; Frank, No. 04-CV-1018, slip op., at *6 ("The bottom line is that Gold'n Plump has, at a minimum, decided not to require that its employees be paid for donning and doffing. That no-policy policy has allegedly injured all members of the putative class and is properly challenged through a class action.").  Haugen Aff. Ex. 44.

### 2. Differences in damages do not constitute grounds for decertification.

Defendant's complaint about the difficulties involved with determining the appropriate amount of damages is also insufficient to decertify the class.  When a defendant's arguments weighing in favor of decertification go mostly to damages, the motion for decertification should be denied.  Kautsch, 2008 WL 294271 (W.D. Mo. Jan. 31, 2008) (when there was a common question of whether defendant maintained records in compliance with the FLSA, "decertification even on the issue of damages is not warranted," because the court could create damage subclasses if plaintiffs established liability at trial) Haugen Aff. Ex. 1; Sheinberg v. Sorensen, 2006 WL 2460649 (D. N.J. 2006) (affirming trial court's denial of motion to decertify a class where the parties

agreed that damages sustained by each member would be different) Haugen Aff. Ex. 46;

Bayles v. Am. Med. Response of Colo., Inc., 950 F. Supp. 1053, 1060 (D. Colo. 1996)

("disparities in damages claimed by the representative parties and the other members of

the class do not warrant decertification").[4]  This is consistent with the purpose of the

FLSA collective action provision, which is to provide for "one lawsuit in which the

claims of different employees, different in amount but all arising out of the same

character of employment, can be presented and adjudicated, regardless of the fact that

they are separate and independent of each other."  Shaine, 40 F. Supp. at 490.

Defendant's assertion that a class action would be unmanageable simply because

all of the named and opt-in Plaintiffs do not have identical damages amounts is

unfounded.  Mendez v. Radec Corp., 232 F.R.D. 78, 93 (W.D.N.Y. 2005) ("defendants'

assertion that the necessity of conducting a series of mini-trials will render a class action

unmanageable is an insufficient reason for denying class certification.").  "There are a

number of management tools available to a district court to address any individualized

damages issues that might arise in a class action, including: (1) bifurcating liability and

damage trials with the same or different juries; (2) appointing a magistrate judge or

special master to preside over individual damages proceedings; (3) decertifying the class

**after** the liability trial and providing notice to class members concerning how they may

---

[4] Defendant cites Bayles for the proposition that a jury could be confused by the Court's
instruction that Plaintiffs are similarly situated while the Defendant argues that they are
different.  (Def. Br. at 23.)  However, this language in Bayles is inapplicable here,
because the court's analysis with regard to jury confusion dealt with individualized proof
of liability, rather than damages, as in this case.  Bayles, 950 F. Supp. at 1065 ("It is
oxymoronic to use such a device in a case where proof regarding each individual plaintiff
is required to show **liability**.").

proceed to prove damages; (4) creating subclasses; or (5) altering or amending the class."
In re Visa Check/MasterMoney Antitrust Litigation, 280 F.3d 124, 141 (2nd Cir. 2001).

Rather than decertifying a collective class when damages may vary, the preferred method is to simply bifurcate the trial into liability and damage phases. See, e.g. Falcon v. Starbucks Corp., 2008 WL 155313, at *10 (S.D. Tex. Jan. 15, 2008) (decertification of a collective action denied even though individual damages may vary, because the court was willing to consider bifurcating the liability and damages stages of the trial if needed in the interest of judicial economy) (citing Thiebes v. Wal-Mart Store, Inc., 2004 WL 1688544, at *1 (D. Or. Jul. 26, 2004) (bifurcating collective action involving allegations of unpaid overtime and off-the-clock work into separate liability and damages phases)) Haugen Aff. Exs. 47, 48; Wilks, 2006 WL 2821700, at *7 ("the court will consider bifurcation of the case into a liability stage, where the parties could address the alleged existence of an impermissible policy or practice, and a damages one, where they could, if necessary, debate the impact of that policy or practice on individual plaintiffs.") (citing Thiessen, 267 F.3d at 1106 (reversing a district court's decision to decertify a collective action where bifurcation of the case into a liability phase and a damages one was possible)). Haugen Aff. Ex. 45. Thus, variances in damages are better addressed when calculating damages during that phase of a bifurcated trial, rather than on a motion for decertification. Frank, No. 04-CV-1018, slip op., at *6 (denying a motion for decertification even when "varying practices of the supervisors may mean that some employees have less damage than others . . . "). Haugen Aff. Ex. 44.

Slight variances in damages do not belie the fact that Plaintiffs are "similarly situated" under the FLSA. Defendant's arguments in favor of decertification on these grounds therefore fail, particularly in light of the numerous alternative procedural mechanisms at the Court's disposal.

### 3. Defendant fails to cite any authority for its request for decertification.

Defendant fails to cite any relevant authority for its request for decertification under circumstances of such similarlity between plaintiffs. Rather, Defendant extensively cites and misconstrues Anderson v. Cagle's, Inc., 488 F.3d 945 (11th Cir. 2007) for the proposition that varying articles of clothing can defeat certification of a collective action. (Def. Br. at 17.) In fact, the Anderson court ruled on a multitude of other grounds, all of which are inapplicable here. Primarily, the court decertified the collective action, based on its finding that the named plaintiffs were not similarly situated to the opt-in plaintiffs due to the varying identities of the employers, multiple locations and workforces, various compensation methods, and various protective clothing. Anderson, 488 F.3d at 952.

None of these factors apply in this case. The Plaintiffs worked in every possible area of the plant, and were required to don and doff every possible form of protective gear as a result. (Poole Dep. at 20-26, 34-36, 38-39, Jan. 30, 2008; Kasten Dep. at 28-30, 38-39, Feb. 22, 2008.) Both of the named Plaintiffs were required to clock-in and clock-out for their shifts and meal breaks. (Kasten Dep. at 58-59, 47-48, Feb. 22, 2008; Poole Dep. at 27-28, 38-39, Jan. 30, 2008.) Mr. Kasten also worked on shifts for which he

received paid and unpaid lunch breaks.  (Kasten Dep. at 29-33, 58-59, 47-48, Feb. 22, 2008.)  Although Defendant argues that Mr. Kasten and Mr. Poole did not work the fourth or fifth shifts, the evidence demonstrates that these two shifts are no different from the first or second shifts in any relevant respect.  Thus, every possible member of the collective action is fairly represented by the named Plaintiffs in this case.  Further, all Plaintiffs were employed by Defendant in the same Portage, Wisconsin plant.  All were subject to the same compensation methods, based upon the time clock records.  All were subject to the same donning and doffing policies and procedures governing the various areas of the plant.  It is difficult to imagine a factual and employment situation in which the named and opt-in Plaintiffs could be **more** similarly situated.

> **B.    The Second Factor Weighs In Favor Of A Collective Action, Because All Of The Named And Opt-In Plaintiffs Are Subject To The Same Potential Defenses.**

The second factor also favors proceeding as a collective action, because the potential defenses involved pertain to the class as a whole, rather than to particularized individuals.  See Moss, 201 F.R.D. at 409.  Decertification based on this factor is only appropriate in the exceedingly rare case where individualized defenses would prevent an efficient proceeding.  Id.  See also Falcon, 2008 WL 155313, at *10 ("[S]tanding alone, the prospect of individual defenses should not defeat authorization of a collective action," because defendants may still raise asserted defenses by examining representative plaintiffs and presenting evidence at trial) (quoting Rodolico v. Unisys Corp., 199 F.R.D. 468, 484 (E.D.N.Y. 2001).  Haugen Aff. Ex. 47.  However, that is not that case here.

No single individual Plaintiff is subject to a different defense than the others. Indeed, Defendant admits that it intends to assert the same two defenses with respect to all Plaintiffs: (1) that Plaintiffs' uncompensated donning and doffing time was *de minimus*; and (2) that Plaintiffs took extended paid breaks.   (Def. Br. at 19-21.) Decertification should be denied when there are "only two common defenses rather than a series of individual defenses . . . raised against each plaintiff." <u>Moss</u>, 201 F.R.D. at 410.

Moreover, Defendant's inappropriate emphasis on the merits of the legal claims and defenses is unavailing because the merits of the legal claims and defenses are not evaluated during a second stage analysis. <u>Thiessen</u>, 267 F.3d at 1106-07.  Additionally, disputes arising from the proper amount of damages should not be considered "defenses" for decertification purposes. <u>Pendlebury</u>, No. 04-80521-CIV, slip op. at 30-31.  Haugen Aff. Ex. 41.  Thus, Defendant's arguments pertaining to the merits of its *de minimus* defense and set-offs – both of which go to the amount of Plaintiffs' damages - are misplaced.

Because the Plaintiffs are all subject to the same defenses, they are similarly situated in this regard.  <u>See</u>, <u>e.g.</u>  <u>Hutton</u>, No. CV 03-2262-PHX-ROS, slip op. at 4 ("Defendant's defense will in large measure be the same with respect to all Plaintiffs— that Defendant properly classified Plaintiffs as exempt.") Haugen Aff. Ex. 42; <u>Doornbos</u>, No. 04CV00044, slip op. at 8 ("Because Plaintiffs have shown, however, that the class members' job responsibilities are similar and Pilot's procedures are standardized by the corporate office . . . it is unlikely that the defenses against their claims are going to

differ.").  Haugen Aff. Ex. 43.  Thus, the defenses involved should not make a collective

trial unmanageable in any way.

C.    **The Third Factor, Fairness And Procedural Considerations, Weighs In Favor Of A Collective Action.**

Finally, fairness and procedural considerations mandate that this case be tried as a

collective action.  In evaluating this factor, courts consider that the primary objectives of

the FLSA's collective action provision are to: (1) lower the costs to the Plaintiffs through

the pooling of resources; and (2) limit the controversy to one efficient proceeding that

resolves common issues of law and fact arising from the same alleged activity.  Moss,

201 F.R.D. at 409 (citing Hoffmann-La Roche, Inc. v. Sperling, 493 U.S. 165, 170

(1989)).  Courts also evaluate whether they can coherently manage the class in a manner

that will not prejudice any party.  Id.  See also Berger v. Cleveland Clinic Found., 2007

WL 2902907 *20-21 (N.D. Ohio 2007); Wilks, 2006 WL 2792218, at *8.  Haugen Aff.

Exs. 49, 50.

Defendant makes the ludicrous argument that this case should be decertified,

placing the parties and the Court in an unprecedented position of repetitive chaos.

Decertification in the present case would simply force the Plaintiffs to file individual

claims, resulting in an enormous burden for Plaintiffs, Defendant, and the Court.  See

Hoffmann-La Roche, Inc., 493 U.S. at 170 (1989) (a collective action affords plaintiffs

"the advantage of lower individual costs to vindicate rights by pooling of resources.");

Wilks, 2006 WL 2821700 at *8 ("[A]ny requirement that each plaintiff prove his or her

claims individually would waste more judicial time and resources than trying their cases

23

individually would preserve.") Haugen Aff. Ex. 45; <u>Doornbos</u>, No. 04CV00044, slip op. at 9 ("Collective treatment will also result in the economy of judicial resources.") Haugen Aff. Ex. 43; <u>Bradford</u>, 184 F. Supp. 2d at 1351 ("As a practical matter, [sic] Plaintiffs can hardly be expected to pursue small claims individually, so there is little likelihood that their rights will be vindicated in the absence of a collective action.").

At this point, over 150 individuals have joined this collective action.  If the Court were to rule in favor of the Defendant, the parties and this Court would face the possibility of more than 150 individual actions, consisting of the same questions of law and fact, with parties who all worked at the same location, completed the same donning and doffing duties, were subject to the same policies and procedures, and were supervised by the same managerial staff.  In sum, **the parties and the Court could be forced to arrange for 150 nearly identical trials, in front of 150 juries, all within in the exact same venue.**  Moreover, this kind of multiple-case litigation could result in varying outcomes dealing with exact the same issues.  <u>Hutton</u>, No. CV 03-2262-PHX-ROS, slip op. at 4 ("[If] the individual Plaintiffs maintained separate suits, inconsistent interpretations of whether Defendant properly classified Plaintiffs as overtime exempt may result.").  Haugen Aff. Ex. 42.

Defendant cites no authority to support its position that a collective class of over 150 Plaintiffs should be decertified, when all of the cases would be in the same jurisdiction because all of the parties worked on the same premises and were supervised by the same managerial staff.  The only authority Defendant cites involves decertification of collective actions when the Plaintiffs worked in multiple venues, in different states, for

different supervisors.  <u>Anderson</u>, 488 F.3d at 949 (decertifying a collective class when plaintiffs worked in "several" locations in at least two states); <u>Lusardi v. Xerox Corp.</u>, 118 F.R.D. 351, 357 (D. N.J. 1987) (decertifying nationwide collective class, where the sample group of plaintiffs "were employed by seventeen different Xerox Groups or organizations in thirty-four cities or towns in sixteen different states.").  Defendant's arguments therefore do not apply to this case.

Moreover, had Defendant paid Plaintiffs for their donning and doffing time to begin with, it would not be in the position to complain about the difficulties involved with determining how much Plaintiffs should be paid.  Defendant should not be permitted to fail to accurately record work time and deny Plaintiffs pay for work they performed, and then later benefit from its policy of not documenting work time by claiming that it is too difficult to determine how much is owed.  <u>Kautsch</u>, 2008 WL 294271, at *4 ("An employer may not benefit from its failure to keep employment records as required under 29 U.S.C. § 211(c).") (citing <u>Mumbower v. Callicott</u>, 526 F.2D 1183, 1186 (8th Cir. 1975)).  Haugen Aff. Ex. 1.  <u>See</u> <u>also</u> <u>Mendez</u>, 232 F.R.D. 78 (denying decertification of a class in an off-the-clock case).  The remedy for this issue is not decertification, but the use of damage estimates in a single trial.  "The employer cannot be heard to complain that the damages lack the exactness and precision of measurement that would be possible had he kept records in accordance with [29 U.S.C. § 211(c)]. . . . It is enough under these circumstances if there is a basis for a reasonable inference as to the extent of the damages."  <u>Dove v. Coupe</u>, 759 F.2d 167, 174 (D.C. Cir. 1985).

Defendant also claims that it would be unfairly prejudicial to instruct a jury that

the Plaintiffs are similarly situated, when Defendant intends to prove that they have varying damage amounts.  However, as explained above, damages are not a proper consideration for a decertification motion, and Plaintiffs may have varying damage amounts despite being similarly situated for purposes of certification.  The Court could easily utilize a number of other procedural tools to address damages in a collective action.  Defendant's concerns are therefore without merit.

Denial of Defendant's Motion would ensure lower costs to the Plaintiffs through the pooling of resources, and limit the controversy to one efficient proceeding that resolves common issues of law and fact arising from Defendant's policies and practices.  See Moss, 201 F.R.D. at 409.  Both parties and the Court stand only to benefit from a collective trial.  Defendant's Motion should therefore be denied.

## CONCLUSION

In sum, this case should proceed collectively, because Plaintiffs are similarly situated, as required by section 216(b) of the FLSA.  First, Plaintiffs' factual and employment settings are not only similar, but nearly identical.  Second, Defendant admits that it intends to apply the *de minimus* and set-off arguments to everyone in the class, rather than simply to one or two individuals.  Third, fairness and procedural considerations indicate that a collective action would allow for the pooling of resources, and ensure that the controversy would be limited to one efficient proceeding addressing Defendant's failure to pay Plaintiffs for their donning and doffing time.  Plaintiffs therefore respectfully request that the Court deny Defendant's Motion in full.

26

DATE:  April 4, 2008                              NICHOLS KASTER & ANDERSON, PLLP


By: s/Adrianna S. Haugen
James H. Kaster   MN Bar # 53946
        WI Bar #  1001474
        E-mail: kaster@nka.com
Paul J. Lukas, MN Bar # 22084X
            (admitted in Western District of WI)
Sarah M. Fleegel  MN Bar # 34557X
        (admitted in Western District of WI)
        E-mail: fleegel@nka.com
Jessica J. Clay        MN Bar # 318772
        (admitted in Western District of WI)
        E-mail: clay@nka.com
Adrianna S. Haugen WI Bar #1064788
        E-mail: haugen@nka.com
4600 IDS Center
80 South Eighth Street
Minneapolis, Minnesota  55402
Office:  (612) 256-3200
Fax:  (612) 338-4978

FOX & FOX, S.C.

Michael R. Fox     WI Bar # 01015173
        E-mail: mfox@foxquick.com
Randall B. Gold    WI Bar # 1034435
        E-mail: RGoldLaw@aol.com
124 West Broadway
Monona, Wisconsin 53716
Office:  (608) 258-9588
Fax:  (608) 258-9105

ATTORNEYS FOR PLAINTIFFS