**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WISCONSIN**

---

KEVIN KASTEN, et al.,

               Plaintiffs,

    v.                                           Case No. 07-C-0449 C

SAINT-GOBAIN PERFORMANCE
PLASTICS CORPORATION,

               Defendant.

---

## BRIEF IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

---

### INTRODUCTION

This case demonstrates a fundamental reality of the industrial world – that not all time spent at work is compensable and not all non-work time goes uncompensated. The law permits some flexibility in what qualifies as compensable work time, as it must given human nature and economic realities.

Contrary to plaintiffs' Kevin Kasten and James Poole's ("Plaintiffs") contention, a genuine dispute of material fact exists on the questions of whether there is *any* uncompensated work time that should be compensated, or if so, how much time. As set forth in the arguments below and defendant Saint-Gobain Plastics Corporation's ("SGPP") responsive and additional proposed findings of fact, there is more than sufficient evidence to cast doubt on Plaintiffs' assertion that they were not compensated for time spent donning and doffing protective gear and that SGPP should have compensated them for that time. Also, SGPP has adduced evidence to refute Plaintiffs' argument that SGPP willfully violated the Fair Labor Standards Act. Finally, because there is a legitimate question whether Plaintiffs can actually demonstrate any

uncompensated work time, they cannot prevail on their state law claims.  As a result, SGPP respectfully asks the Court to deny Plaintiffs' motion for summary judgment.

## FACTUAL BACKGROUND

SGPP has its principle place of business in Ohio, and operates a manufacturing facility in Portage, Wisconsin.  (Plaintiffs' Proposed Findings of Fact in Support of Motion for Summary Judgment ("Plts.' PFF") ¶ 1".)  On August 15, 2007, two of SGPP's former employees, Kevin Kasten and James Poole, brought this putative collective and class action lawsuit on behalf of themselves and other similarly situated manufacturing and production workers at SGPP's Portage, Wisconsin facility ("Plaintiffs").  (Plts.' PFF ¶ 2.)

Plaintiffs allege violations of the Federal Fair Labor Standards Act of 1938, 29 U.S.C. § 201 et seq.  (Plts.' PFF ¶ 10.)  Plaintiffs also allege violations of Wisconsin wage statutes and regulations, Wis. Stat. § 109.03 and Wis. Admin. Code DWD §§ 272.03, 272.04(1), 274.03, and state common law, including breach of contract, unjust enrichment, and quantum meruit.  (Plts.' PFF ¶ 11.)

### A.     Work Shifts And Timekeeping.

Because the Portage plant continuously operates seven days per week around the clock, SGPP maintains five shifts of workers.  (Plts.' PFF ¶ 13.)  Although the number of workers varies substantially by shift, the largest shift includes roughly 70 employees who are required to don and doff gear.  (Defendant's Response to Plaintiffs' Statement of Proposed Findings of Fact ("Deft's Resp. to Plts.' PFF") ¶ 14.)

All hourly-paid workers at the Portage plant are given individualized Kronos cards to clock-in and clock-out for their shifts, and with the exception of third shift, meal breaks on time clock machines.  (Plts.' PFF ¶ 15.)  The Kronos system records each worker's work time, based

on the time clock punch times and the shift assigned to each worker in the system. (Plts.' PFF ¶ 16.) SGPP bases its weekly payroll on the Kronos reports for the workers. (Plts.' PFF ¶ 17.)

### B.    Protective Gear And Work Departments.

SGPP manufactures a number of products which must remain free from external sources of contamination. (Plts.' PFF ¶ 24.) SGPP's products include silicone rubber components for medical devices, such as intravenous pumps, feeding pumps, intravenous lines, diaphragms, and components for cataract surgery, as well as other high volume products, such as spatulas and spoons. (Plts.' PFF ¶ 25.) Additionally, the Portage facility operates as a make-to-order manufacturing plant, so that some products are variable depending upon customer orders. (Plts.' PFF ¶ 26.) Some of the required gear serves to facilitate production of SGPP's products by enabling workers to perform the functions of their jobs without injury or burns. (Plts.' PFF ¶ 28.) The type of gear workers are required to wear varies depending upon where they are stationed in the facility, and what work they will perform for the day. (Plts.' PFF ¶ 29.)

The Portage plant consists of four general areas with gowning requirements: (1) Platinum Clean Room 1 and 2; (2) General Manufacturing; (3) Extrusion; and (4) Other Areas. (Plts.' PFF ¶ 30.) The protective items that workers wear depend upon where the worker is located in the facility and which materials the worker handles. (Defendant's Additional Proposed Findings of Fact ("Dft.'s PFF") ¶ 10.)

Workers stationed in Platinum Clean Rooms 1 and 2, including Gland Coordinators and Gland Utilities, are required to wear: safety shoes, safety glasses, hair covers, beard covers, jump suits, ear plugs, gloves, shoe covers, and for some employees, arm guards. (Plts.' PFF ¶ 32.)

The General Manufacturing area includes the Millable Injection Molding, Lim Molding, Barwell Mill, and Transfer Molding areas of the plant. (Plts.' PFF ¶ 33.) Workers in the positions of Fabricator, Mill Operator, and House Wear Coordinator work in the General

Manufacturing area.  (Plts.' PFF ¶ 34.)  Before December 2006, General Manufacturing workers were required to wear safety shoes, safety glasses, hair covers, beard covers, lab coats, and sometimes earplugs, gloves and for some employees, arm guards.  (Dft.'s PFF ¶ 12.)

Extruders work in the Extrusion area of the facility.  (Plts.' PFF ¶ 36.)  Before December 2006, workers assigned to Extrusion wore safety shoes, safety glasses, hair covers, beard covers, jump suits, earplugs and sometimes gloves.  (Dft.'s PFF ¶ 13.)

The areas of the plant designated "Other" include the Development Center, Tool Room, Hydraulics and Shipping.  (Dft.'s PFF ¶ 14.)  Development Center workers wear safety shoes and safety glasses, and on rare occasions, may wear hair covers, beard covers, lab coats, fabric hoods, ear plugs, gloves, and arm guards, depending upon what products are being produced.  (Dft's Resp. to Plts.' PFF ¶ 39.)  Tool Room and Hydraulics employees wear safety shoes and safety glasses.  (Plts.' PFF ¶ 40.)

The area to which workers are assigned can vary during their tenure at SGPP and from day to day.  (Dft.'s PFF ¶ 11.)  Before December 11, 2006, the clocking and donning/doffing procedure varied because employees used different time clocks to punch in and out and because the type and amount of protective gear depended upon where the employee worked at SGPP.  (Dft.'s PFF ¶ 38.)

**C.    Donning And Doffing Sequences.**

Before December 2006, many workers had already "punched in" when they donned and doffed much of their protective gear.  (Dft.'s PFF ¶ 1.)  For example, before December 2006, employees who worked in the Platinum Clean Room were compensated for donning and doffing most of their protective gear because the donning occurred after the employees punch in according to the following sequence:

1.    Enter building.
2.    Put outer clothing in locker.

    3.      Replace street shoes with safety shoes.
    4.      Put on safety glasses.
    5.      Proceed to platinum clean room area.
    6.      **Punch in.**
    7.      Proceed into gowning area.
    8.      Wash hands.
    9.      Put on hair covers.
    10.    Put on jump suit.
    11.    Put on shoe covers.
    12.    Put in hearing protection.
    13.    Use hand sanitizer.
    14.    Proceed into platinum clean room.

(Dft.'s PFF ¶ 2.)  When leaving the Platinum Clean Room, employees often followed this sequence:

    1.      Leave the platinum clean room.
    2.      Enter gowning area.
    3.      Take off the shoe covers.
    4.      Take off the jump suit.
    5.      Take off the hair cover.
    6.      Walk out of the gowning area.
    7.      **Punch out.**
    8.      Walk to locker room and remove safety shoes and safety glasses.
    9.      Exit the building.

(Dft.'s PFF ¶ 3.)  For Platinum Clean Room employees, donning occurred after their shift had begun, and doffing occurred before the shift ended.  (Dft.'s PFF ¶ 4.)

Extrusion area employees donned their hair covers, shoe covers, jump suits, and hearing protection after they punched in and after their shift had begun.  (Dft.'s PFF ¶ 5.)  Also, before December 2006, employees who worked in the General Manufacturing area could have walked into the warehouse area of the facility and punched in before "gowning up."  (Dft.'s PFF ¶ 6.)

Employees who worked in "Other Areas" of the facility often performed the following donning sequence:

    1.      Enter building.
    2.      Enter locker room.
    3.      Put on safety shoes and safety glasses.
    4.      Walk to their work area.
    5.      **Punch in**.

(Dft.'s PFF ¶ 7.) When leaving the work area, SGPP employees who worked in "Other Areas" performed the above activities in reverse, punching out before removing their safety shoes and glasses in the locker room. (Dft.'s PFF ¶ 8.)

Fabric hoods were not a part of the gowning process in any area prior to the summer of 2007. (Plts.' PFF ¶ 41.) However, following customer complaints of hair in the products, SGPP began requiring certain workers to don this form of gear as well. (Plts.' PFF ¶ 42.)

With the exception of prescription safety glasses, all required gear is washed, disposed of, or stored on-site to preserve the integrity of the products and the cleanliness of the workplace. (Plts' PFF ¶ 43.) Workers are not permitted to wear their safety shoes out of the building. (Plts.' PFF ¶ 44.) Fabric smocks and hoods, arm guards, and fabric knit gloves also remain on-site. (Plts.' PFF ¶ 45.) Earplugs, hair nets, beard guards, shoe covers, and nitrile gloves are disposable items that are only available on-site, and discarded after use. (Plts.' PFF ¶ 46.)

Workers are trained on donning and doffing procedures and how to clock-in and out for their shifts during orientation. (Plts.' PFF ¶ 47.) At the start of each shift, hourly manufacturing and production workers are currently required to clock-in before donning required gear. (Plts.' PFF ¶ 48.) After clocking in, they go to the locker room to remove their outer clothing, change into their safety shoes, and put on their safety glasses. (Plts.' PFF ¶ 49.) Next, they proceed to the gowning area to don the remaining required gear. (Plts.' PFF ¶ 50.) Some workers are also required to sanitize their hands or clean their shoes in a shoe cleaner. (Plts.' PFF ¶ 51.) This process is completed in reverse at the end of the shift. (Plts.' PFF ¶ 52.)

**D.      Time Spent Donning, Doffing, Sanitizing And Walking And Avoidable Delays.**

According to SGPP's expert witness Jeffrey Dr. Fernandez[1], the median total time that it took an employee to don and doff items each day before December 11, 2006 ranged from 4.117 minutes to 4.755 minutes per shift (weighted for shifts 1 through 3), depending upon whether the employee worked in General Manufacturing, Platinum Clean Room or Extrusion areas, exclusive of any deductible non-work time for which SGPP compensated the employee.  (Dft.'s PFF ¶ 15.) To calculate the pre-December 2006 median total time of 4.366 minutes for donning and doffing in the General Manufacturing area, Dr. Fernandez measured the time needed to don and doff safety shoes, safety glasses, hair cover and labcoat, as well as the walking time to and from the time clock located in the General Manufacturing area.  (Dft.'s PFF ¶ 16-17.)  To calculate the pre-December 2006 median total time for donning and doffing in the General Manufacturing area, Dr. Fernandez measured the time needed to don and doff the required protective gear pre-shift, pre-meal break, post-meal break and post-shift and did not include removing shoes before the meal break.  (Dft.'s PFF ¶ 18.)  Workers are not required to doff their safety shoes or safety glasses during meal breaks unless they leave the building.  (Dft.'s PFF ¶ 14.)

To calculate the pre-December 2006 median total time of 4.117 minutes for donning and doffing in the Platinum Clean Room areas, Dr. Fernandez measured the time needed to don and doff safety shoes and safety glasses, as well as the walking time to and from the time clock in the Platinum Clean Room areas.  (Dft.'s PFF ¶¶ 19-20.)  To calculate the pre-December 2006 median total time for donning and doffing in the Platinum Clean Room areas, he measured the time needed to don and doff the required protective gear pre-shift, pre-meal break, post-meal

---

[1] It should be noted that Dr. Fernandez timely filed and served his report on March 11, 2008.  In his Declaration filed in support of SGPP's Motion for Partial Summary Judgment, Dr. Fernandez incorporated by reference his full report.

break and post-shift and did not include removing shoes before the meal break.  (Dft.'s PFF ¶ 21.)

To calculate the pre-December 2006 median total time of 4.755 minutes for donning and doffing in the Extrusion area, Dr. Fernandez measured the time needed to don and doff safety shoes, safety glasses, hair cover and labcoat, as well as the walking time to the time clock in either the General Manufacturing Area or the Tool Room at the start of shift, and to the time clock in the Extrusion area at the end of shift and at the start and end of meal breaks.  (Dft.'s PFF ¶¶ 22-23.)  To calculate the pre-December 2006 median total time for donning and doffing in the Extrusion area, Dr. Fernandez measured the time needed to don and doff the required protective gear pre-shift, pre-meal break, post-meal break and post-shift and did not include removing shoes before the meal break.  (Dft.'s PFF ¶ 24.)

Dr. Fernandez excluded avoidable delays when calculating the median don and doff times.  (Dft.'s PFF ¶ 25.)  According to Dr. Fernandez, "avoidable delays" include non-work related activities like sitting in the cafeteria, talking to co-workers, arranging personal equipment after swiping at the start of the shift, and waiting to swipe at the swipe clock, talking to co-workers and donning street clothes before swipe at the end of shift.  (Dft.'s PFF ¶ 26.)  Dr. Fernandez concluded that on average employees in the General Manufacturing area spent 9.326 minutes in avoidable delays; employees in the Platinum Clean Rooms 1 and 2 areas spent 17.351 minutes in avoidable delays; and employees in the Extrusion area spent 12.766 minutes in avoidable delays.  (Dft.'s PFF ¶ 27.)  According to Dr. Fernandez, the "avoidable delay" time estimates can apply both before December 2006 and after December 2006.  (Dft.'s PFF ¶ 28.)

Dr. Fernandez used the median, rather than the mean, as an estimate of true time it takes to perform donning and doffing because most of the activities were not normally distributed and thus it is more statistically accurate to use the median.  (Dft.'s PFF ¶ 29.)

With the exception of third shift workers, who receive a twenty-minute paid meal break, hourly workers receive an unpaid thirty-minute lunch break with an additional five-minute paid wash-up period.  (Plts.' PFF ¶ 54.)  Employees are allowed several ten-minute paid rest breaks during all five shifts.  (Dft.'s PFF ¶ 30.)  Employees are allowed two ten-minute paid breaks during shifts one, two, and three, and three ten-minute paid breaks during shifts four and five.  (Dft.'s PFF ¶ 31.)  At least fourteen production employees and former employees have testified that it is common for employees to take breaks in excess of ten minutes.  (Dft.'s PFF ¶ 32.)  Because employees are not required to clock-in and clock-out before and after the rest break, any break time taken by an employee in excess of the ten-minute paid break allowance is compensated by the Company.  (Dft.'s PFF ¶ 33.)

Additionally, Dr. Fernandez found that employees took rest breaks beyond the ten minute allowance.  (Dft.'s PFF ¶ 34.)  Employees working in the General Manufacturing area took an average of 3.908 additional minutes per rest break per shift.  (Dft.'s PFF ¶ 35.)  Employees working in the Platinum Clean Rooms took an average of 5.908 additional minutes per rest break per shift.  (Dft.'s PFF ¶ 36.)  Employees working in the Extrusion area took an average of 4.823 additional minutes per rest break per shift.  (Dft.'s PFF ¶ 37.)  Employees in the three work areas took an aggregate (weighted average) of 4.604 minutes per rest break per shift in excess of the ten-minute paid break allowance.  (Dft.'s PFF ¶ 38.)

Some workers arrived early to socialize and drink coffee, others arrived "right on the wire."  (Dft.'s PFF ¶ 40.)  Some workers socialized while waiting to punch in.  (Dft.'s PFF ¶ 41.)  For example, one worker described the beginning of her day as follows:

> Q:     Okay.  Now, between the time, and you estimated you would enter on your typical day the locker room about 6:15 a.m., and would you generally begin standing in line about 6:27 at the clock in the general manufacturing area?
>
> **A:     Yes.**

> Q:     Okay.  And did you do anything else besides gown between 6:15 and 6:27?
>
> **A:     It didn't take me that long to gown, so I would say I probably talked to some people.**
>
> Q:     Okay.  How long did it take you to gown?
>
> **A:     I'd guesstimate between three and five minutes.  It just depended on what was available for the day to wear.**
>
> Q:     Okay.  And then you think the rest of the time you may just be chatting with fellow workers?
>
> **A:     Yes.**

(Dft.'s PFF ¶ 42.)  Dr. Fernandez noted in his report that his measurements could overstate the actual time for donning and doffing because he and his associates observed that "many employees arrived at the facility well in advance of the start of the shift.  This enabled them to don without any time constraints which caused them to don at a slower pace."  (Dft.'s PFF ¶ 44.)

At one time, SGPP had a time clock by the entrance door of the General Manufacturing area that people used to punch in and then gown up.  (Dft.'s PFF ¶ 45.)  According to one SGPP employee, speaking of this time clock, "[t]here was a time clock right by the door, but they moved it because people were punching in, and then going back out and have a cigarette or whatever they did, I don't know."  (Dft.'s PFF ¶ 46.)

After subtracting the five-minute meal break wash up allowance, breaks in excess of scheduled breaks and non-work related activities, Dr. Fernandez calculated the median time that employees spent donning and doffing before December 2006 to be -8.090 for the General Manufacturing area, -12.980 for the Platinum Clean Rooms and -9.832 for the Extrusion area.  (Dft.'s PFF ¶ 39.)

E.       **SGPP Relocated Time Clocks In December 2006.**

On or before December 11, 2006, SGPP placed time clocks near the employee entrance to the Portage plant.  (Plts.' PFF ¶ 61.)  As a result, workers were able to clock-in prior to donning, and clock-out after doffing the required gear, and were paid for this time.  (Plts.' PFF ¶ 61.)  SGPP placed time clocks near the employee entrance to help workers remember to punch in and out.  (Dft.'s PFF ¶ 9.)  Plaintiffs' collective and class claims related to donning and doffing therefore pertain to the timeframe prior to the placement of the time clocks near the employee entrance.  (Plts.' PFF ¶ 23.)

SGPP states that the time clocks were moved to a "more convenient, more intuitive" location near the employee entrance, in an effort to "eliminate the problem of people forgetting to punch in or out."  (Plts.' PFF ¶ 62.)  Former Human Resource Manager Dennis Brown stated, "employees were forgetting to punch. And the belief was that by moving [the time clocks] to the entrance that would help them remember to punch."  (Plts.' PFF ¶ 63.)

In the fall of 2005, prompted by a recent Supreme Court action, SGPP examined the question of whether the meal and rest breaks comply with state laws around the country.  Around the same time, SGPP also investigated the question of whether its compensation policies complied with applicable laws regarding payment to individuals for the time that they spend sanitizing and donning and doffing gear.  (Dft.'s PFF ¶ 47.)  Shift Supervisor Dennis Woolverton stated that he read an article on-line before the time clocks were placed near the employee entrance, which stated that the Supreme Court ruled that donning and doffing time may be compensable.  (Plts.' PFF ¶ 75.)  Sometime in the fall of 2005, Mr. Woolverton sent an e-mail to Human Resources Generalist Lani Wruck-Williams regarding this Supreme Court case.  (Plts.' PFF ¶ 76.)

Following the Supreme Court's decision in *IBP, Inc. v. Alvarez*, 546 U.S. 21 (2005), SGPP's Human Resources Department discussed the decision's impact, if any, on the business. (Dft's. PFF ¶ 48.) On a conference call attended by all facility-level Human Resource Managers, as well as the two corporate Human Resources Directors, Al Jones and Scott Bentley, SGPP developed a plan by which to assess the company's compliance with applicable wage and hour laws. (*Id.*) Corporate Human Resources Manager Mary Lou DeSimone prepared a survey questionnaire in consultation with SGPP's legal department, Mr. Bentley and Mr. Jones. (Dft's. PFF ¶ 49-50.) The survey asked each SGPP production plant to provide information about the location of time clocks at the plant, the time spent donning and doffing protective gear and any walking time. (Dft's. PFF ¶ 50.) In addition, the survey asked what amount of donning and doffing time occurred while employees were "off-the-clock." (*Id.*)

Portage Human Resources Manager Lani Williams, with the assistance of a shift supervisor, prepared the response to the survey for the Portage facility. (Dft's. PFF ¶ 51.) Upon receiving the survey results, Ms. DeSimone consulted with Messrs. Bentley and Jones, a well as the SGPP legal department. (Dft's PFF ¶ 52.) The company determined that the amount of donning and doffing time, if any, fell below the *de minimis* threshold and did not require compensation. (*Id.*) Shortly thereafter, this conclusion was communicated to all Human Resource Managers at the plants during a Human Resources Department conference call. (Dft's. PFF ¶ 53.)

## ARGUMENT

## I.   STANDARD OF REVIEW

"In ruling on a motion for summary judgment, a district court has one task: to decide whether there is any material dispute of fact that requires a trial." *Sun v. Bd. of Trs. of Univ. of Ill.*, 473 F.3d 799, 812 (7th Cir. 2007). Summary judgment is appropriate if the moving party

has demonstrated, through its pleadings and other record materials filed with the court, that no genuine issue of material fact exists for trial and that it is entitled to judgment as a matter of law. *Adreani v. First Colonial Bankshares Corp.*, 154 F.3d 389, 393 (7th Cir. 1998) (citing Fed. R. Civ. P. 56(c) and *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)). All reasonable inferences from the underlying facts are drawn in favor of the nonmoving party and the burden of demonstrating that there is no genuine issue of material fact falls on the moving party. *Adreani*, 154 F.3d at 393. To avoid summary judgment, the nonmoving party must set forth specific facts showing a genuine issue for trial. *Id.*

## II.   THERE IS A GENUINE ISSUE OF MATERIAL FACT REGARDING THE QUESTION OF WHETHER THERE IS ANY UNCOMPENSATED WORK TIME, OR IF ANY, WHETHER IT IS *DE MINIMIS*.

### A.   There Is No Uncompensated Time.

The Fair Labor Standards Act ("FLSA") requires employers to pay overtime "for employment in excess of [forty hours each week] at a rate not less than one and one-half times the regular rate at which [the employee] is employed." *Austin v. CUNA Mut. Ins. Soc.*, 232 F.R.D. 601, 604 (W.D. Wis. 2006) (citing 29 U.S.C. § 207(a)(1)). Donning and doffing of specialized protective gear performed either before or after the regular work shift are compensable under the FLSA if those activities are "integral and indispensable part of the principal activities for which covered workmen are employed and are not specifically excluded by Section 4(a)(1)." *IBP, Inc. v. Alvarez*, 546 U.S. 21, 30 (2005).

Plaintiffs seek compensation under the FLSA, 29 U.S.C. § 216(b), for time spent donning and doffing certain items of protective gear, including a gown or full body suit, steel-toed shoes, a hair net and a beard guard, and sanitizing their hands. (Plts.' PFF ¶¶ 23, 32, 35, 37, 39-40.) Plaintiffs' claim that time spent on these "mandatory work activities" amounts to 13.15 to 14.16 minutes per day per person. (Plts.' PFF ¶ 56.) SGPP disputes the amount of time that Plaintiffs

claim it takes to don and doff the various items per person per day.  (Deft's Resp. to Plts.' PFF ¶ 56.)

First, contrary to Plaintiffs' contention, the amount and type of protective gear donned and doffed by Plaintiffs varied by the area in which an employee worked and where they chose to take their breaks.  (Plts.' PFF ¶¶ 29; Dft.'s PFF ¶¶ 10, 15.)  SGPP employees could work in a number of different areas throughout their tenure at SGPP as well as throughout each day.  (Dft.'s PFF ¶ 11.)  Employees who worked in the Platinum Clean Rooms or Extrusion areas donned most of their protective gear after they punched in and their shift had begun, and therefore SGPP has already compensated those employees for that time.  (Dft.'s PFF ¶¶ 2-5.)  Employees who went outside on their breaks had to remove more items than those who chose to stay inside.  (Dft.'s PFF ¶ 15.)  Thus, to the extent that Plaintiffs attempt to treat all workers' donning and doffing activities the same, Plaintiffs' argument is unavailing.

Second, SGPP disputes the amount of time Plaintiffs contend that they spent donning and doffing protective gear "off the clock."  According to Dr. Fernandez's observations and measurements, the total amount of time spent donning and doffing protective gear before swiping their Kronos card pre-shift, pre-breaks, post-breaks and post-shift by employees who worked in the General Manufacturing, Platinum Clean Room and Extrusion areas ranged from 4.117 to 4.755 minutes.  (Dft.'s PFF ¶ 15.)  This amount is approximately eight minutes different than the averages provided by Plaintiffs and excludes any deductions for compensated time and "avoidable delays" that the employees may have had while donning and doffing their gear.  (Dft.'s PFF ¶ 25; *see also Anderson v. Mt. Clemens Pottery C*o., 326 U.S. 680, 692 (1946) (superseded by statute on other grounds) (compensable working time limited to the minimum time necessarily spent in walking at an ordinary rate along most direct route from time clock to work bench).)  Because the amount of time that Plaintiffs spent donning and doffing is in

dispute, there is a genuine issue of material fact that must be resolved by the factfinder. *See, e.g., Ballaris v. Wacker Siltronic Corp.*, 370 F.3d 901, 912 (9th Cir. 2004) (because amount of time is in dispute, there is genuine issue of material fact to be resolved by the factfinder).

Moreover, if one factors in the average amount of time employees took beyond their allotted break time and the five-minute meal break "wash up" allowance, the amount of time actually becomes a negative number, ranging from -8.090 to -12.980 minutes. (Dft.'s PFF ¶ 39.) Accordingly, SGPP has already compensated Plaintiffs beyond what they claim they are owed.

Courts have repeatedly concluded in FLSA cases that time compensated but not worked offsets time worked but not compensated. In *Barefield v. Village of Winnetka*, 81 F.3d 704, 710 (7th Cir. 1996), police officers and civilian dispatchers were required to attend a fifteen minute roll call meeting before the start of each day, for which they were not compensated. However, their employer compensated them for a thirty minute lunch period each day during which they performed no work. *Id.* Plaintiffs claimed that the fifteen minute roll call meetings were compensable. *Id.* The court agreed, but held that because "the meal periods are not compensable under the FLSA," the employer "may properly offset the meal break against the compensable roll call time worked by Plaintiffs." *Id.; see also Avery v. City of Talladega*, 24 F.3d 1337, 1347 (11th Cir. 1994) (employer was allowed "to offset the meal break against the compensable pre- and post- shift time worked by the plaintiffs"); *Bolick v. Brevard County Sheriff's Dept.*, 937 F. Supp. 1560, 1572 (M.D. Fla. 1996) (defendant "may properly offset paid [but not compensable] meal breaks against any compensable pre- and post- shift time worked by the plaintiffs"); *Cloutier v. City of Phenix City*, 834 F. Supp. 366, 372 (M.D. Ala. 1993) (non-compensable lunches could offset preshift compensable time); *Agner v. U.S.*, 8 Cl. Ct. 635, 638 (Cl. Ct. 1985) (duty free lunch period can be offset against compensable pre-shift and post-shift activities).

Similarly, in this case, Plaintiffs seek compensation they claim they are due for time spent donning and doffing certain items of protective gear.  However, the deposition testimony of no fewer than nineteen SGPP current and former employees demonstrates that the Plaintiffs have routinely been compensated by SGPP for time during which they have not performed compensable work, including time for washing up and re-gowning after meal breaks and excessive rest break time.  Additionally, Platinum Clean Room and Extrusion area employees are routinely compensated for time spent donning and doffing protective gear.  Because the amount of time spent donning and doffing is in dispute and because SGPP has offered evidence that there is no uncompensated time at issue, the court should deny Plaintiffs' motion for summary judgment.

**B.     Even If There Was Uncompensated Time, That Time Was *De Minimis* And Therefore Not Compensable.**

Even if one rejects the idea that there is no uncompensated time because of an offset with compensated non-work time, the amount of time that Plaintiffs spent donning and doffing is *de minimis* under the FLSA, particularly when one considers the measurements by Dr. Fernandez and the industrial realities of the workplace.

**1.     Application of the *de minimis* doctrine requires a weighing of facts.**

In discussing the *de minimis* rule under the FLSA, the Supreme Court in *Mt. Clemens Pottery* noted that the workweek contemplated by the FLSA must be computed in light of the "realities of the industrial world."  328 U.S. at 692.  The Court further stated:

> When the matter in issue concerns only a few seconds or minutes of work beyond the scheduled working hours, such trifles may be disregarded.  Split-second absurdities are not justified by the actualities of working conditions or by the policy of the Fair Labor Standards Act.  It is only when an employee is required to give up *a substantial measure of his time and effort* that compensable working time is involved.

*Id.* (emphasis added).  Moreover, the Seventh Circuit has stated that "no rigid rules can be laid down with mathematical certainty as to when the *de minimis* rule applies" and that "each situation presented must be examined in the light of what is 'substantial' and 'reasonable' in view of all the factors present."  *Frank v. Wilson & Co.*, 172 F.2d 712, 716 (7th Cir. 1949). Given this fact-intensive, multi-factor test, affirmative summary judgment is generally inappropriate.

However, courts have found that amounts of time similar to those at issue here were *de minimis* as a matter of law.  In *Frank*, for example, the Seventh Circuit examined whether an employer's policy requiring employees to be dressed in their working clothes, receive instructions from their supervisors, obtain their tools from tool chests and cabinets and walk to the place where plaintiffs were required to be was *de minimis* and therefore not compensable under FLSA.  *See* 172 F.2d at 714.  The employer admitted that it did not pay employees for the five minutes before the shift started when employees were conducting these pre-shift activities. *Id.*  Nevertheless, the *Frank* court held that the five minutes at issue was *de minimis*.  *Id.* at 716.

### 2.    The amount of time at issue is nonexistent or insubstantial.

Similar to the factual circumstances in *Frank*, the donning and doffing time at issue in this case took less than five minutes.  According to Dr. Fernandez, the median total time that it took an employee to don and doff items each day before December 11, 2006 ranged from 4.117 minutes to 4.755 minutes (weighted for shifts 1 through 3), depending upon whether the employee worked in General Manufacturing, Platinum Clean Room or Extrusion areas, and exclusive of any deductible non-work time for which SGPP compensated the employee.  (Dft.'s PFF ¶ 15.)  These measurements do not even account for avoidable delays.  (Dft.'s PFF ¶ 25.) "Avoidable delays" include non-work related activities like sitting in the cafeteria, talking to co-workers, arranging personal equipment after swiping at the start of the shift, and waiting to

swipe at the swipe clock, talking to co-workers and donning street clothes before swipe at the end of shift.  (Dft.'s PFF ¶ 26.)  Dr. Fernandez concluded that on average employees in the General Manufacturing area spent 9.326 minutes in avoidable delays; employees in the Platinum Clean Rooms 1 and 2 areas spent 17.351 minutes in avoidable delays; and employees in the Extrusion area spent 12.788 minutes in avoidable delays.  (Dft.'s PFF ¶ 27.)

It is undisputed that SGPP employees engage in avoidable delays when donning and doffing their protective gear.  For example, some workers arrive early to socialize and drink coffee, and others arrive "right on the wire."  (Dft.'s PFF ¶ 41.)  Moreover, some workers socialize while waiting to punch in.  (Dft.'s PFF ¶ 42.)  For example, one worker described the beginning of her day as follows:

> Q:     Okay.  Now, between the time, and you estimated you would enter on your typical day the locker room about 6:15 a.m., and would you generally begin standing in line about 6:27 at the clock in the general manufacturing area?
>
> **A:     Yes.**
>
> Q:     Okay.  And did you do anything else besides gown between 6:15 and 6:27?
>
> **A:     It didn't take me that long to gown, so I would say I probably talked to some people.**
>
> Q:     Okay.  How long did it take you to gown?
>
> **A:     I'd guesstimate between three and five minutes.  It just depended on what was available for the day to wear.**
>
> Q:     Okay.  And then you think the rest of the time you may just be chatting with fellow workers?
>
> **A:     Yes.**

Dft.'s PFF ¶ 43.  According to this worker, the actual gowning process didn't take long, and the bulk of her time was spent socializing before punching the time clock.  Dr. Fernandez noted in his report that his measurements could overstate donning and doffing time because he and his

associates observed that "many employees arrived at the facility well in advance of the start of the shift.  This enabled them to don without any time constraints which caused them to don at a slower pace."  (Dft.'s PFF ¶ 44.)

Under *Mt. Clemens Pottery*, compensable working time was limited to "the minimum time necessarily spent in walking at an ordinary rate along the most direct route from time clock to work bench."  328 U.S. at 692.  Likewise, any compensable donning and doffing time should be calculated according to the minimum time necessary to don and doff at an ordinary rate without any avoidable delays.  Thus, to the extent that any of the "guesstimates" provided by Plaintiffs of their total uncompensated don and doff time included any "avoidable delays," those "guesstimates" must be disregarded under *Mt. Clemens Pottery*.[2]

Using time measurements provided by SGPP's expert for donning and doffing and the guidance provided by both *Mt. Clemens Pottery* and *Frank*, the less than five minutes that it took employees to don and doff is *de minimis*.  *Mt. Clemens Pottery*, 328 U.S. at 692; *Frank*, 172 F.2d at 716.

Further, when one factors in the excessive break times and the five minute wash-up allowance, the amount of any uncompensated time is extinguished completely.  SGPP allows its employees to take several ten minute paid breaks each work day, depending upon which shift they work, and does not require those employees to punch in and out for those breaks.  (Dft.'s PFF ¶¶ 30, 31, 33.)  It is undisputed that at least fourteen production employees and former employees have testified that it is common for employees to take breaks in excess of ten minutes.  (Dft.'s PFF ¶ 32.)   It is undisputed also that any break time taken by an employee in excess of the ten-minute paid break allowance is compensated by the Company.  (Dft.'s PFF ¶ 33.)

---

[2] SGPP has separately moved to strike the "guesstimates" of plaintiffs on the basis that such testimony amounts to inadmissible rank speculation.

Additionally, SGPP's expert found that employees indeed took rest breaks beyond the ten minute allowance.  (Dft.'s PFF ¶¶ 34-38.)  Employees working in the General Manufacturing area took an average of 3.908 additional minutes per rest break per shift.  (Dft.'s PFF ¶ 35.)  Employees working in the Platinum Clean Rooms took an average of 5.908 additional minutes per rest break per shift.  (Dft.'s PFF ¶ 36.)  Employees working in the Extrusion area took an average of 4.823 additional minutes per rest break per shift.  (Dft.'s PFF ¶ 37.)  Employees in the three work areas took an aggregate (weighted average) of 4.604 minutes per rest break per shift in excess of the ten-minute paid break allowance.  (Dft.'s PFF ¶ 38.)

### 3.   Requiring compensation for any negligible donning and doffing time is unreasonable in light of industrial realities.

Given the small amount of time at issue, a fact-finder must also determine whether the administrative costs and economic realities make SGPP's practices reasonable.  As this Court has held, "the need to compensate an employee for her work must be weighed against the cost or difficulty of providing compensation.  As the amount of time decreases for an employee to perform tasks, so does the employer's duty to provide compensation for those tasks when doing so would impose administrative costs."  *Spoerle v. Kraft Foods Global, Inc.*, 527 F. Supp. 2d 860, 869 (W.D. Wis. 2007) (denying summary judgment on *de minimis* question).  As noted in *Spoerle*, the *de minimis* exception applies when there are uncertain and indefinite periods of time involved of a few seconds or minutes duration, and where the failure to count such time is due to considerations justified by industrial realities. *Id.* When looking at the all the factors present, as this Court must do pursuant to *Frank*, the uncompensated time at issue, if any, is *de minimis*. *Frank*, 172 F.2d at 716 (when evaluating *de minimis* rule, each situation must be examined in light of what is substantial and reasonable in view of all factors present).  At a minimum, this inquiry requires an evaluation and weighing of facts that is only appropriate for a jury.

Plaintiffs argue that because there would be no administrative burden on SGPP to record the donning and doffing time and because that time was substantial, the *de minimis* exception does not apply. (Plts.' Br. at 8-9.) However, under *Frank*, the *de minimis* rule applies if the time involved is insubstantial and defendant's compensation practices are "reasonable" in view of all the factors present. *Frank*, 172 F.2d at 716 (focusing on the insubstantiality of the time at issue and holding that the five minutes was not compensable); *see also Mt. Clemens Pottery*, 328 U.S. at 692 ("It is only when an employee is required to give up a substantial measure of his time and effort that compensable working time is involved."). In *Spoerle*, this Court noted that the test is a scale based upon the amount of time and the administrative cost. *Spoerle*, 527 F. Supp. 2d at 869.

Similar to circumstances in *Spoerle,* this Court is faced with a motion for summary judgment with material facts in dispute. *Id.* at 869. If this Court were to grant Plaintiffs' motion for summary judgment, this Court would have to do one of the following: 1) accept Plaintiffs' "guesstimates" of their don and doff time, conclude that offsets do not matter or reject the possibility that the offsets presented by SGPP exist, and find that Plaintiffs' guesstimates are compensable because Plaintiffs have shown that the Kronos system records accurate time; or 2) accept SGPP's don and doff times as found by Dr. Fernandez, reject SGPP's offset argument and conclude that less than five-minutes must be compensated because it can be recorded. Under either scenario, this Court will effectively eliminate the *de minimis* defense and the fact-specific, industrial reality inquiry it entails. With today's technology, one could argue that all time can be recorded to the minute. But, as many courts have found, including the courts in *Frank* and *Mt. Clemens Pottery,* the *de minimis* defense weighs more than just the administrative burden of recording time. Industrial reality plays a role, arguably a significant one in today's workplace if the *de minimis* defense is to still exist. Thus, SGPP emphasizes that the amount of time is in

dispute and is important.  As noted above, SGPP, unlike Plaintiffs, has introduced competent evidence that the time involved is not substantial.

Plaintiffs cite 29 CFR § 785.47 in support of their emphasis on the administrative burden for recording time.  (Plts.' Br. at 8.)  But even the Department of Labor regulations recognize that failure to count insubstantial time is outside the scope of the FLSA when such time is "due to considerations justified by industrial realities."  *See* 29 CFR § 785.47.  As noted above, when one considers SGPP employees' excessive breaks and five minute wash-up period, as well as avoidable delays, there is no uncompensated time.  Moreover, Department of Labor regulations may serve as informative guidelines, but they are not binding on this Court.  *See* 29 CFR § 785.2 ("ultimate decisions in interpretations of the act are made by the courts"); *see also Skidmore v. Swift & Corp.*, 323 U.S. 134, 137 (1944) ("Congress did not utilize the services of an administrative agency to find facts and to determine in the first instance whether particular cases fall within or without the Act.").

The industrial reality is that when employees are "on the clock" and not under direct supervision, there is a natural tendency to take advantage of that paid, unsupervised time and for many, that means stretching it out for as long as possible.  The approach advanced by Plaintiffs would have the perverse effect of rewarding the most inefficient workers and those who "game" the system.  Even according to Plaintiffs' "guesstimates," the amounts of time spent donning, doffing and walking vary wildly.  (*See* Plt.'s PFF ¶ 56)  (indicating a range between six and thirty minutes pre- and post-shift, and a range between eight and twenty minutes during lunches). A conclusion that donning and doffing time, without consideration of how much time it should take an employee to perform these activities would encourage slow and inefficient behavior.

In fact, this effect can be observed in practice; overcompensation was prevalent when SGPP previously placed time clocks near employee entrances.  For example, when SGPP had

previously placed a time clock just inside the entrance door to the General Manufacturing area, employees abused the time clock system.  According to one employee, "[t]here was a time clock right by the door, but they moved it because people were punching in, and then going back out and have a cigarette or whatever they did, I don't know."  (Dft.'s PFF ¶ 46.)  Placing time clocks near entrance doors promotes opportunities to "game the system" because there is more activity and less supervision by entrance doors at SGPP.  In fact, SGPP's expert observed many avoidable delays after SGPP placed time clocks by the employee entrance, and concluded that he may have overestimated his don and doff times because employees could don at a slower pace if they had arrived early at the facility.  (Dft.'s PFF ¶ 44.)  The trade-off for placing time clocks by the employee entrance is that fewer employees will forget to punch in and out.  (Dft.'s PFF ¶ 9.)

Plaintiffs' approach would also reward employees who take excessively long breaks. Many of the opt-in plaintiffs testified that their own breaks typically lasted significantly longer than the ten-minute break allowance compensated by the company.  (Dft.'s PFF ¶ 32.) Moreover, Dr. Fernandez observed that these breaks lasted 3.908 to 5.908 additional minutes per rest break.  (Dft.'s PFF ¶¶ 34-38.)  Thus, no matter where SGPP places a time clock and no matter how much or how little protective gear employees must don and doff each day, as long as it provides compensated breaks and a five-minute "wash" up period, the industrial reality is that SGPP ends up paying for all an employee's work time, and then some.  SGPP's expert calculated these "overpayments" to be 8.090 minutes for the General Manufacturing area, 12.980 minutes for the Platinum Clean Rooms and 9.832 minutes for the Extrusion area, pre-December 2006. (Dft.'s PFF ¶ 39.)

By requiring SGPP to pay its employees for insubstantial donning and doffing time when employees already spend that time in avoidable delays, are provided an additional five minutes of paid time for such activity and take excessive breaks for which they are compensated, the

Court would create a rigid atmosphere that ignores industrial reality and discourage workplace efficiency.   Consequently, those who now don and doff most slowly and spend the most time engaging in non-work activities while on the clock receive the most compensation.  This result is unfair to employees who do not "game the system."

The *de minimis* rule as dictated by *Frank* and *Mt. Clemens Pottery* allows courts the flexibility to consider all the factors in each case to determine whether employees are spending substantial time and effort in unpaid work time.  Even omitting avoidable delays, Plaintiffs have spent less than five minutes donning and doffing in a day.  Under *Frank*, this time is *de minimis*. When one factors in the paid five minute wash-up period and the excessive paid breaks, the unpaid donning and doffing time is nonexistent.  At a minimum, each of these factors is the subject of a factual dispute, and their weight is an issue for the trier of fact.  As a result, the Court should deny Plaintiffs' motion for summary judgment.

## III.   SGPP DID NOT ACT WILLFULLY IN ITS ALLEGED FLSA VIOLATION.

Plaintiffs argue that not only was their uncompensated donning and doffing time substantial, but that SGPP willfully violated the FLSA by not paying them for that time because it was aware of the Supreme Court's decision in *IBP, Inc*, and it never investigated whether SGPP was in violation of the FLSA.  Plts.' Br., at 10-11.

As an initial matter, a determination of willfulness is plainly an issue of state of mind for the trier of fact, and mere awareness of a law is not enough to show willfulness.  *McLaughlin v. Richland Shoe Corp*., 486 U.S. 128, 134 (1988).  As the court noted in *McLaughlin*:

> [T]he 'in the picture' standard seems to give too little effect to Congress's express intent to create two tiers of liability in the FLSA limitations provision.  Among employers eventually found to have violated the FLSA, it would seem that there are not many who did not know that the Act was 'in the picture.'  It may be 'virtually impossible for an employer to show that he was unaware of the Act and its potential applicability.'

*Id.* (citing *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 128 (1985)).  Likewise, when the Supreme Court decided *Alvarez*, most employers were probably aware of the decision.

In this matter, SGPP performed a reasonable inquiry and determined that it was in compliance with all applicable laws.  After reviewing an article regarding the *Alvarez* decision, Shift Supervisor Dennis Woolverton notified SGPP managers about the article.  Specifically, sometime in the fall of 2005, Mr. Woolverton sent an e-mail to Human Resources Generalist Lani Wruck-Williams regarding this Supreme Court case.  (Plts.' PFF ¶ 76.)

In response to *Alvarez*, in the Fall of 2005 SGPP management examined the question of whether employees at each of its facilities were properly being compensated for the time that they spend sanitizing, walking and donning and doffing protective gear.  (Dft.'s PFF ¶¶ 47 and Plts.' PFF ¶ 81) (referring to the review that SGPP conducted regarding whether employees should be paid for their donning and doffing time).  Specifically, the *Alvarez* decision was discussed on several Human Resources Department conference calls, and a survey questionnaire was prepared to assess the impact, if any, of the decision.  (Dft's. PFF ¶¶ 48-51.)  The questionnaire asked each facility to provide information about the location of time clocks at the plant and the time spent walking, and donning and doffing protective gear.  (Dft.'s PFF ¶ 50.)  A time study was performed at the Portage facility, and in consultation with the legal department, the company concluded that any uncompensated time was not compensable.  (Dft's. PFF ¶¶ 51-52.)  After this conclusion was communicated to the Portage facility's Human Resources personnel, they believed that they were not required to modify compensation policies.  (Dft's. PFF ¶ 53.)  These actions refute the Plaintiffs' argument that SGPP failed to investigate whether it was in compliance with the law.

At a minimum, these facts raise a material dispute as to Plaintiffs' argument that SGPP acted knowingly or with reckless disregard of the FLSA requirements.  To the contrary, SGPP

responded to the *Alvarez* decision by examining whether it was in compliance with the FLSA. The Court cannot conclude as a matter of law that SGPP did not act reasonably in response to any question that was raised in the industry about paying employees for donning and doffing time. *Bankston v. State of Ill*., 60 F.3d 1249, 1254 (7th Cir. 1995) (court may not find willfulness and award liquidated damages where employer shows that it acted in good faith with reasonable grounds to believe that its actions did not violate FLSA). Accordingly, SGPP respectfully asks the Court to deny Plaintiffs' motion for summary judgment on the issue of willfulness.

## IV.    BECAUSE PLAINTIFFS WERE COMPENSATED FOR ALL OF THEIR WORK TIME, THERE WERE NO COMMON LAW VIOLATIONS

For the same reasons stated above, the Court must deny Plaintiffs' motion for summary judgment on each of their common law claims. The premise behind each of Plaintiffs' common law claims is that SGPP failed to pay them for all their time spent donning and doffing. (Plts.' Br., at 14-15.) At a minimum, SGPP has raised a dispute of material fact as to whether Plaintiffs were compensated when one factors in the five-minute "wash-up" period, the excessive breaks and the avoidable delays in donning and doffing. According to Dr. Fernandez, total uncompensated time pre-December 2006 was -8.090 for employees working in the General Manufacturing Area, -12.980 for employees working in the Platinum Clean Rooms and -9.832 for employees working in the Extrusion area. (Dft.'s PFF ¶ 39.) Because there is a genuine issue of material fact, the Court must deny Plaintiffs' motion for summary judgment on each of its common law claims of breach of contract, quantum meruit and unjust enrichment.

**V.    THERE IS A GENUINE ISSUE OF MATERIAL FACT REGARDING UNPAID MEAL AND REST BREAK TIME**

Plaintiffs argue that because they spent between 11.25 and 12.5 minutes donning and doffing during lunch, SGPP violated Wis. Admin. Code § DWD 272.04(1), which requires employers to pay employees for "on duty" meal periods.  According to Plaintiffs, "on duty" meal periods are those that last less than 30 minutes.  Plaintiffs' argument fails for two reasons.  First, Plaintiffs' argument fails to acknowledge the undisputed fact that SGPP pays employees an extra five-minutes "wash up" period after their meal break.  (Plts.' PFF ¶ 54.)  Second, as already noted, the amount of uncompensated donning and doffing time is in dispute.  According to SGPP's expert, the median total time that an employee spent donning and doffing each day before December 11, 2006 ranged from 4.117 minutes to 4.755 minutes (weighted for shifts 1 through 3), depending upon whether the employee worked in General Manufacturing, Platinum Clean Room or Extrusion areas, exclusive of any deductible time for which SGPP compensated the employee.  (Dft.'s PFF ¶ 15.)  Because a material fact dispute exists, the Court must deny Plaintiffs' motion for summary judgment on Plaintiffs' meal break claim.


**CONCLUSION**

SGPP has introduced evidence which establishes that Plaintiffs suffered no uncompensated time for donning and doffing when one factors in excessive paid breaks, the five-minute paid wash-up period and the avoidable delays.  To the extent that there was any uncompensated time, it was *de minimis* pursuant to United States Supreme Court and Seventh Circuit law.  In addition, because it is undisputed that SGPP investigated its compliance with FLSA after it became aware of the *Alvarez* case, it acted reasonably and did not willfully violate the statute.  For these reasons, the Court should deny Plaintiffs' summary judgment motion on all counts.

Dated this 4th day of April, 2008.

Respectfully submitted,


*s/Jeffrey A. McIntyre*
Jeffrey A. McIntyre
Anthony J. Sievert
Kelly M. Dvorak
Barbara J. Zabawa
Attorneys for Saint-Gobain Performance
Plastics Corporation


Of Counsel:

WHYTE HIRSCHBOECK DUDEK S.C.
33 E. Main Street, Suite 300
Madison, WI  53703
Telephone: (608) 255-4440
Fascimile: (608) 258-7138
Email: jmcintyre@whdlaw.com